## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Harrisonburg Division

| | |
|---|---|
| **AWP, INC.,**      ) | |
|      ) | |
|     **Plaintiff,**      ) | |
|      ) | |
| **v.**      ) | **Civil Action No.: _____** |
|      ) | |
| **COMMONWEALTH EXCAVATING, INC.**  ) | |
|      ) | |
| **Serve at:**    c/o Ira Biggs, Registered Agent  ) | |
|              40 Sutton Rd  ) | |
|              Verona, VA  24482  ) | |
|      ) | |
| **and**      ) | |
|      ) | |
| **IRA J. BIGGS,**      ) | |
|      ) | |
| **Serve at:**    215 Lebanon Church Rd  ) | |
|              Staunton, VA 24401-6405  ) | |
|      ) | |
|     **Defendants.**      ) | |

### COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff AWP, Inc. (a.k.a. "Area Wide Protective") (hereinafter the "Plaintiff" or "AWP"), by and through its attorneys, for its Complaint against Defendants Commonwealth Excavating, Inc. (hereinafter "Commonwealth") and Ira Biggs (hereinafter "Mr. Biggs" or hereinafter collectively the "Defendants") avers and alleges as follows:

### NATURE OF COMPLAINT

1.     This is an action for common law conspiracy, statutory business conspiracy, misappropriation of trade secrets, unfair competition, tortious interference with contract or business relationship and unjust enrichment.  These actions arise out of Defendants' actual and threatened misappropriation of AWP's trade secrets and diversion of AWP's customers.

## PARTIES

2.     AWP is incorporated under the laws of the State of Ohio with its principal place of business in Kent, Ohio.  AWP is authorized to and does conduct business in Virginia.   It maintains a facility located at 20706 Jefferson Highway, Fishersville, Virginia 22939.

3.     Mr. Biggs resides at 215 Lebanon Church Road, Staunton, Virginia  24401-6405. Mr. Biggs is the President of Commonwealth.

4.     Commonwealth is a company organized under the laws of Virginia with its principal place of business located at 40 Sutton Road, Verona, Virginia 24482.

5.     Commonwealth is predominately an excavating company.  However, within the last year, Commonwealth has expanded its business efforts to include the traffic control business.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C § 1332 as the amount in controversy exceeds the sum of $75,000, exclusive of fees and costs, and AWP is a citizen of a different state than the defendants.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.  All of the Defendants reside in the Commonwealth of Virginia.  Both Defendants reside in this District, and a substantial part of the events giving rise to the Complaint occurred in this District.

## GENERAL ALLEGATIONS

## AWP'S BUSINESS OPERATIONS

8.     AWP is a national leader in comprehensive traffic control solutions for road construction sites and emergency situations, including work zone drawings and design, flagging, work zone set up and tear down, steel road plate pick-up and delivery, cathodic inspections, training, and equipment rental.

2

9. AWP employs approximately 1,000 people in 17 states.

10. AWP's business requires a substantial investment in equipment, including trucks, cones, barrels, flags, signs, and steel plates.

11. AWP operates in a highly competitive industry in which the protection of customer goodwill, trade secrets, and confidential business information is of critical importance.

12. AWP considers, among other things, the identity, particular needs and issues of its customers, pricing, and its protocols and methodologies for traffic control as confidential and proprietary (hereinafter collectively the "Trade Secrets"). AWP derives independent economic value from the Trade Secrets not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.

13. Because of the highly competitive nature of the industry, AWP's competitors, including Commonwealth, also consider the above information regarding the specific needs and issues of its own customers, pricing and its protocols and methodologies for traffic control as confidential and proprietary.

14. These Trade Secrets are not readily known outside of AWP's business.

15. AWP has taken and continues to take reasonable efforts to keep its Trade Secrets confidential and not generally known. Only a limited number of AWP's employees know or have access to the Trade Secrets. For example, customer identities and pricing history are not shared among the entire sales force. Specific customer information and pricing is not maintained in any general corporate database, but rather is preserved at the local level to minimize distribution of this information even within AWP's company employees.

16. A person who had no prior access to these Trade Secrets would have severe difficulty in duplicating or acquiring the same information on his/her own.

## SHAWN WATKINS' EMPLOYMENT HISTORY WITH AWP

17.     AWP hired Shawn Watkins in February 2011 as an Operations Manager at AWP's Fishersville, Virginia location.  He was subsequently promoted to Regional Sales Manager for Virginia, North Carolina, South Carolina and Maryland.

18.     As part of his position of trust and confidence, Mr. Watkins had access to and use of AWP's Trade Secrets.  Specifically, he had access to and use of AWP's customer identities and specific needs and issues, customer lists, pricing and related information, and the protocols and methodology for traffic control.  By virtue of his employment with AWP, Mr. Watkins also had access to and use of AWP's confidential and proprietary documents, and computer files.

19.     By virtue of his employment and use of these Trade Secrets and other confidential and proprietary information and property, Mr. Watkins was aware that such Trade Secrets and other confidential and proprietary information and property held great value to the Company, not only for the Company's business and financial interests, but also to maintain and support the Company's experience, goodwill and reputation with its customers.  Accordingly, Mr. Watkins was also aware, by virtue of his employment and use of these Trade Secrets and other confidential and proprietary information and property, that disclosure of such materials to a competitor of AWP would be damaging to AWP's business and financial interest, as well as its experience, goodwill and reputation with its customers.

20.     On November 9, 2012, Mr. Watkins tendered his resignation from AWP, effective November 30, 2012.  AWP relieved Mr. Watkins of his duties effective November 19, 2012, and agreed to pay Mr. Watkins through his intended resignation date.

21.     Upon his termination, Mr. Watkins was instructed to return to AWP all property of AWP, including, but not limited to, cellular telephones, computers, credit cards, office keys, computer discs, and computer files.

22.     Although AWP provided Mr. Watkins with a company computer, Mr. Watkins never turned it on for use.  Instead, Mr. Watkins conducted all of his work for AWP on his personal computer.  Therefore, he accessed, used and retained AWP's Trade Secrets and confidential information on his personal computer, without permission or consent by AWP. Upon information and belief, after the termination of his employment, Mr. Watkins did not delete this information or the files from his personal computer, and he has refused to submit his personal computer to a computer expert for review and deletion of these files.  Accordingly, after his termination of employment with AWP, Mr. Watkins has had, and continues to have, unauthorized access and possession of AWP's Trade Secrets and confidential and proprietary information.

## TRAFFIC CONTROL SOLUTIONS, LLC

23.     Upon information and belief, in or around July 2012, Mr. Watkins and his wife, Kelly Watkins, together mutually undertook, planned and agreed to create a new business entity, Traffic Control Solutions, LLC ("TCS"), to perform substantially similar services as AWP, in the same geographic region as AWP, and seeking business from the same customers and clients of AWP.  Mr. and Mrs. Watkins, under a common plan and design, created the entity TCS during Mr. Watkins' continued employment with AWP and based upon the Trade Secrets and other confidential and proprietary information belonging to AWP to which Mr. Watkins had access by virtue of his employment with AWP.

24.     Both Mr. and Mrs. Watkins played an instrumental role in the creation, founding and registration of TCS as a competitor entity of AWP, and TCS was registered with the Virginia Secretary of State on or about July 6, 2012.

25.     Under the registration of TCS, Mrs. Watkins is the registered "owner" of TCS.

26.     As part of the common design and mutual plan undertaken jointly by Mr. and Mrs. Watkins in the creation, founding and registration of TCS, Mr. Watkins registered the web domain, http://www.tcs-traffic.com, on October 13, 2012, while Mr. Watkins was still employed by AWP.

27.     As part of their common design and mutual plan, Mr. and Mrs. Watkins deliberately created TCS to be a direct competitor of AWP.  Indeed, Mr. and Mrs. Watkins created TCS to perform substantially similar services as AWP, in the same geographic region as AWP, and TCS competed directly for previously-existing customers and clients of AWP.  On its website, TCS holds itself out as "Your One Stop Shop for all of YOUR Traffic Control Needs!"

28.     During this time period, Mr. Watkins and TCS hired Mr. Victor Byers (an AWP employee from May 26, 2011 until December 19, 2012), Mr. Albert Pieper (an AWP employee from July 19, 2010 until December 19, 2012), Mr. Christopher Crismond (an AWP employee from March 2011 until December 20, 2012), and Mr. Richard Carroll (an AWP employee from April 2011 until December 20, 2012) to perform work for TCS during the same hours that these individuals held themselves out to have been working for AWP, and during which time they were, in fact, being compensated by AWP.

29.     Moreover, during this same time period, Mr. Watkins and TCS, acting under a common plan, mutually undertook to purposefully misappropriate both AWP existing customers and potential customers from AWP.  They effectuated this misappropriation of existing customers and potential customers by exploiting AWP's Trade Secrets, including its confidential and proprietary pricing scheme and customer lists, in order to underbid AWP on new contracts.

30.     TCS actually did underbid AWP on new contracts by using AWP's Trade Secrets, with both potential customers of AWP, as well existing customers of AWP, including Lumos Networks ("Lumos"), based in Waynesboro, Virginia.  By and through its unauthorized use and

exploitation of AWP Trade Secrets, confidential and proprietary information, equipment and employees, TCS underbid AWP on new work, acquired new customers away from AWP, and interfered with AWP's legitimate business expectations.

**THREATENED LITIGATION AND SETTLEMENT**

31. Upon discovery of the foregoing facts, AWP prepared a civil Complaint against TCS, Mr. Watkins and others, and AWP planned and prepared to file the Complaint on December 21, 2012, alleging seven (7) Counts for Breach of Fiduciary Duty, Common Law Conspiracy, Statutory Business Conspiracy, Misappropriation of Trade Secrets, Tortious Interference with a Contract or Business Relationship, Unjust Enrichment and Conversion.

32. That same day, however, upon learning of AWP's intent to file a civil Complaint, Mr. Watkins contacted AWP to resolve the matter before the Complaint was filed. As a result of his request for extra-judicial resolution, AWP agreed that it would not file the Complaint.

33. Thereafter, on December 27, 2012 and January 2, 2013, AWP, Mr. Watkins, Mrs. Watkins and TCS entered into a Settlement Agreement (hereinafter the "Settlement Agreement").

34. In exchange for not filing the Complaint, a draft of which was attached to the Settlement Agreement, Mr. and Mrs. Watkins and TCS agreed, among other things, to shutdown TCS's operations by December 28, 2012; that TCS would not seek or perform any additional work, customers or projects; and to dissolve TCS at the "earliest possible time."

35. The Settlement Agreement further restricted, among other things, Mr. and Mrs. Watkins' right and ability to compete with AWP; to work for or with AWP's competitors; to provide consulting services to AWP's competitors; to solicit or assist anyone else in soliciting AWP's customers; to solicit, divert or take away any of AWP's trade, business or goodwill; and to otherwise influence AWP's customers not to do business with AWP.

7

36.     The Settlement Agreement required Mr. Watkins to return to AWP all property of AWP, including all computer files relating to AWP, and to deliver to AWP any personal computers on which any information relating to AWP was stored so that AWP could assure deletion of such information.  To date, Mr. Watkins has not returned AWP's computer files to AWP and has not delivered any personal computer to AWP, and, accordingly, he has and continues to possess, without AWP's consent or authorization, AWP Trade Secrets, proprietary and confidential information, equipment and property.

37.     As part of the Settlement Agreement, Mr. Watkins also executed an Affidavit.  In the Affidavit, Mr. Watkins admitted, among other things: that he was "instrumental" in the creation of TCS while he was still employed by AWP; that he had access to AWP's Trade Secrets; that AWP took appropriate steps to keep its Trade Secrets confidential; that he used AWP's Trade Secrets, equipment and personnel without permission or consent in order to purposefully underbid AWP on jobs and misappropriate AWP customers, including Lumos, and potential customers; that he used without permission or consent AWP's employees and equipment, including cones, traffic signs, pallets, and trucks, for the benefit of TCS; and that he wrongfully possessed AWP's Trade Secrets without AWP's permission or consent on his personal computer.

## THE CONDUCT OF DEFENDANTS

38.     Sometime between Christmas and New Year's Eve, 2012, Mr. Watkins contacted Mr. Biggs to see if he and Commonwealth would be interested in purchasing TCS's equipment and customers.  Upon information and belief, during that conversation, Mr. Watkins advised Mr. Biggs that he had left AWP and started TCS.  Mr. Watkins further informed Mr. Biggs that he and TCS had improperly used AWP's Trade Secrets and confidential and proprietary information.  At the time of this communication with Mr. Biggs, Mr. Watkins knew that

8

Commonwealth was a competitor of AWP, and, by nature of its competitive relationship to AWP, would have an interest in AWP's customer information, customer lead information, cost structure, pricing, and AWP's bidding practices and policies.

39.     Upon information and belief, during this same conversation, Mr. Biggs asked Mr. Watkins to identify TCS's customers that were misappropriated from AWP.  In response, Mr. Watkins informed Mr. Biggs that if Commonwealth hired the employees of TCS, Mr. Watkins would identify for Mr. Biggs and Commonwealth AWP's customers, customer leads, pricing and costs, and policies and practices with respect to competitive bidding.  From this conversation, Mr. Biggs and Commonwealth knew that Mr. Watkins would share AWP's Trade Secrets, confidential information and proprietary information that Mr. Watkins misappropriated and to which Mr. Biggs and Commonwealth had no right.  Based upon this conversation, Mr. Biggs and Commonwealth further knew that the sharing of this misappropriated Trade Secrets and confidential and proprietary information was in exchange for Commonwealth's agreement to hire TCS's former employees.

40.     Upon information and belief, on or about January 4, 2013, Mr. Watkins met with Mr. Biggs and Jason Boxler, Commonwealth's Traffic Control Manager, at White's Truck Stop in Raphine, Virginia, for a breakfast meeting.  During that meeting, Mr. Biggs told Mr. Watkins that he knew that Mr. Watkins had been in business for himself for only a short time and that TCS's customers must have been taken from AWP.  Mr. Watkins confirmed that Mr. Biggs was correct.

41.     Upon information and belief, during that same breakfast meeting of January 4, 2013, Mr. Watkins identified for Mr. Biggs and Commonwealth the customers that TCS had taken from AWP by using AWP's Trade Secrets and the other confidential and proprietary information to underbid AWP.  Mr. Watkins further stated that he believed Commonwealth

9

could secure business from these customers by using AWP's Trade Secrets and other confidential and proprietary information to underbid AWP. Mr. Biggs and Commonwealth accepted these customers with knowledge that they were obtained by using confidential and proprietary information misappropriated from AWP. These customers included, but are not limited to, Lumos, Rockingham Construction, Rappahannock Electric, and Shenandoah Valley Electric Cooperative.

42. Upon information and belief, during the breakfast meeting of January 4, 2013, Mr. Watkins offered to teach Mr. Biggs and Commonwealth how to manage a traffic control operations business and how to use AWP's Trade Secrets and confidential and proprietary information to price jobs and undercut and underbid AWP.

43. Upon information and belief, during the breakfast meeting of January 4, 2013, Mr. Biggs also asked Mr. Watkins whether he would like a job at Commonwealth. Mr. Watkins advised Mr. Biggs that he could not accept employment with Commonwealth because he had entered into a non-compete agreement with AWP. Mr. Watkins indicated, however, that he would help Commonwealth secure the customers that Mr. Watkins and TCS had stolen from AWP by using AWP's Trade Secrets and confidential and proprietary information. During this conversation, Mr. Biggs and Commonwealth knew that Mr. Watkins was offering to share AWP's Trade Secrets and confidential and proprietary information that Mr. Watkins misappropriated and to which Mr. Biggs and Commonwealth had no right.

44. Upon information and belief, after the breakfast meeting of January 4, 2013, Mr. Watkins received a telephone call from an attorney representing Commonwealth. The attorney asked Mr. Watkins if Mr. Watkins was a party to a non-compete agreement with AWP. Mr. Watkins told Commonwealth's attorney that he was a party to a non-compete agreement with AWP and asked Commonwealth's attorney whether the existence of the non-compete agreement

was a barrier to Commonwealth purchasing TCS's equipment.  The attorney informed Mr. Watkins that because of his non-compete agreement with AWP, he would advise Mr. Biggs and Commonwealth not to buy TCS's assets.

45.     Upon information and belief, after the telephone conversation with Commonwealth's lawyer, Mr. Watkins called Mr. Biggs and asked whether the transaction to purchase TCS's assets was off.  Mr. Biggs indicated that he did not have to listen to the lawyer and that he was going to go through with the deal to purchase TCS's equipment, as well as the agreement to hire TCS's employees in exchange for AWP's Trade Secrets and confidential and proprietary information that TCS stole from AWP.

46.     Upon information and belief, prior to January 11, 2013, Mr. Watkins advised Mr. Biggs and Commonwealth that TCS had a contract with Rockingham Construction Company. Mr. Watkins stated that Rockingham Construction had been a customer of AWP, and that to secure the contract from Rockingham Construction, Mr. Watkins and TCS had used AWP's Trade Secrets and confidential and proprietary information to undercut AWP's bid and secure the contract for TCS.

47.     Upon information and belief, on or about January 11, 2013, Mr. Watkins and the Defendants agreed that, for the purchase price of $45,000.00, Commonwealth would purchase from Mr. Watkins and TCS TCS's equipment and the Trade Secrets and confidential and proprietary information Mr. Watkins and TCS had stolen from AWP.  As part of this transaction, Mr. Watkins further agreed to help Defendants secure the business of current and former AWP customers using this information.  Additionally, as part of this transaction, Commonwealth agreed to hire the four (4) TCS employees who had worked previously for AWP and TCS: Victor Byers, Albert Pieper, Richard Carroll and Christopher Crismond.  Mr. Biggs informed

Mr. Watkins and these four employees that he hoped Commonwealth would "be as big as AWP someday."

48.     Upon information and belief, as part of the transaction on January 11, 2013, Mr. Watkins disclosed to Mr. Biggs and Commonwealth AWP's Trade Secrets and other confidential and proprietary information including AWP'S customers, customer leads, costs and pricing and its policies and practices regarding competitive bidding.

49.     Upon information and belief, on or about January 11, 2013, acting under a common plan to purposefully misappropriate AWP's Trade Secrets and confidential and proprietary information, Mr. Watkins, Mr. Biggs, Mr. Boxler and Commonwealth met with a representative of Rockingham Construction, a customer of AWP.  During this meeting, Mr. Watkins informed the representative that TCS was forced to cease operations.  The Defendants then informed Rockingham Construction's representative that Commonwealth would honor TCS's contract pricing.  At the time of this offer by Commonwealth to Rockingham, Mr. Biggs and Commonwealth knew that TCS and Mr. Watkins had purposefully used AWP's Trade Secrets and other confidential and proprietary information in order to underbid and acquire the contract with Rockingham Construction.  Mr. Biggs and Commonwealth purposefully took advantage of AWP's Trade Secrets and confidential and proprietary information in agreeing to match TCS's contract price with Rockingham Construction.

50.     Upon information and belief, on or about January 14, 2013, Mr. Watkins and Mr. Biggs met with a representative of Lumos, a former customer of AWP that TCS had stolen.  Mr. Watkins used AWP's Trade Secrets and other confidential and proprietary information to underbid AWP's pricing and secure the contract for TCS.  Acting under a common plan to purposefully misappropriate AWP's Trade Secrets and confidential and proprietary information, Mr. Watkins, Mr. Biggs and Commonwealth told the Lumos representative that Commonwealth

would honor TCS's pricing. At the time the Defendants offered to match TCS's pricing, they knew that Lumos had been an AWP customer and that Mr. Watkins and TCS had improperly used AWP's Trade Secrets and confidential and proprietary information to undercut AWP and secure the contract for TCS. Mr. Biggs and Commonwealth purposefully took advantage of AWP's Trade Secrets and confidential and proprietary information in agreeing to match TCS's contract price with Lumos.

51. Upon information and belief, on January 14, 2013, Mr. Biggs and Mr. Watkins met with representatives of Rappahannock Electric, former customer of AWP that TCS had stolen. Mr. Watkins used AWP's Trade Secrets and confidential and proprietary information to underbid AWP's pricing and secure the contract with Rappahannock Electric for TCS. Acting under a common plan to purposefully misappropriate AWP's Trade Secrets and confidential and proprietary information, Mr. Watkins, Mr. Biggs and Commonwealth told the Rappahannock Electric representative that Commonwealth would honor TCS's pricing. At the time the Defendants offered to match TCS's pricing, they knew that Rappahannock Electric had been an AWP customer and that Mr. Watkins and TCS had improperly used AWP's Trade Secrets and confidential and proprietary information to undercut AWP and secure the contract for TCS. Mr. Biggs and Commonwealth purposefully took advantage of AWP's Trade Secrets and confidential and proprietary information in agreeing to match TCS's contract price with Rappahannock Electric.

52. Upon information and belief, on or about January 14, 2013, Mr. Biggs advised Mr. Watkins that Commonwealth wanted to hire Mr. Watkins, and he eventually offered Mr. Watkins a salary of $85,000 per year to work for Commonwealth's traffic control business. When Mr. Watkins expressed concern about his non-compete agreement with AWP, Mr. Biggs told him that Commonwealth could "hide" Mr. Watkins on the excavating side of

Commonwealth's business, but that Mr. Watkins would actually manage Commonwealth's traffic control business. Although this job offer was tempting to Mr. Watkins, he ultimately declined it.

53. Upon information and belief, on or about January 14, 2013, Mr. Watkins, Mr. Biggs and Mr. Boxler visited Shenandoah Valley Electric Cooperative for the purpose of acquiring the company's business for Commonwealth. Defendants knew that Shenandoah Valley Electric Cooperative had been a customer of AWP, and that Mr. Watkins, by virtue of his former employment with AWP, knew AWP's Trade Secrets and confidential and proprietary information that could be used by Mr. Biggs and Commonwealth to underbid AWP and secure the contract for Commonwealth. Acting under a common plan, Mr. Watkins, Mr. Biggs and Commonwealth intended to purposefully misappropriate AWP's Trade Secrets and confidential and proprietary information in order to acquire the business of Shenandoah Valley Electric Cooperative for Commonwealth. Mr. Biggs and Commonwealth purposefully took advantage of AWP's Trade Secrets and confidential and proprietary information in seeking the new business from Shenandoah Valley Electric Cooperative.

## COUNT I
### (Common Law Conspiracy)

54. AWP incorporates by reference, as though fully restated herein, the allegations contained in Paragraphs 1 through 55 of the Complaint.

55. Through the actions outlined herein, Defendants mutually undertook to willfully and maliciously injure AWP in its reputation, trade and business.

56. Defendants, as well as Mr. Watkins (collectively, the "Conspirators"), intentionally, without legal justification, through unlawful means, and in concert with one

another, solicited, interfered with and/or entered into contracts with AWP's customers and vendors.

57.     The Conspirators, acting intentionally, without legal justification and in concert with one another, made arrangements to and did, through unlawful means, misappropriate, use and disclose AWP's Trade Secrets, and confidential and proprietary information.

58.     As a direct and proximate result of the conspiracy, AWP suffered damages associated with the loss of business and injury to AWP's reputation and business good will.

59.     In conspiring to injure the business of AWP through the acts described above, Defendants acted with malice and reckless disregard as to the rights of AWP.

60.     AWP prays that the Defendants be ordered to pay AWP such compensatory damages as shall make AWP whole for Defendants' unlawful acts, in an amount to be proven at trial.

61.     AWP prays that the Defendants be ordered to pay AWP punitive damages for its unlawful acts, in an amount to be proven at trial.

62.     AWP prays that the Court enter an order enjoining the Defendants from benefiting from their unlawful acts by prohibiting them either directly or indirectly, from further soliciting, interfering with or entering into any contracts with any of AWP's customers or potential customers; from using AWP's confidential information and Trade Secrets; and from either directly or indirectly soliciting, interfering with, or otherwise attempting to induce any employee of AWP to leave his employ or other relationship with AWP to participate in a business competitive with AWP.

63.     AWP prays that Defendants be ordered to pay to AWP all costs and legal fees incurred in bringing this Complaint and that the Court award against Defendants and in favor of AWP all such other relief as the Court may deem just and appropriate.

## COUNT II
### (Statutory Business Conspiracy)

64.     AWP incorporates by reference, as though fully restated herein, the allegations contained in Paragraphs 1 through 63 of the Complaint.

65.     In violation of Va. Code §§ 18.2-499, et seq., the Conspirators, intentionally conspired with one another, for the purpose of willfully and maliciously injuring AWP in its business.

66.     As a direct and proximate result of the conspiracy in violation of Va. Code §§ 18.2-499, et seq., AWP has suffered damages associated with loss of business, loss of customers, and injury to AWP's reputation and business good will and customers in light of the Conspirators' unlawful acts.

67.     AWP prays that Defendants be ordered to pay AWP, pursuant to Va. Code § 18.2-500, treble damages in an amount equal to three times the amount of compensatory damages awarded at trial.

68.     AWP prays that Defendants be ordered to pay AWP, pursuant to Va. Code § 18.2-500, all costs and attorney's fees incurred in this action.

69.     AWP prays that Defendants be permanently enjoined, pursuant to Va. Code § 18.2-500, from enjoying the benefit of their unlawful conspiracy by prohibiting them from, either directly or indirectly: (i) soliciting any of AWP's actual or prospective customers that are known or should reasonably be known; or (ii) interfering with any of AWP's customer relationships, business or potential business.  AWP prays that the Court enter an order enjoining Defendants from benefiting from their unlawful acts by prohibiting them from either directly or indirectly soliciting, interfering with, or otherwise attempting to induce any AWP employee to leave his employ or other relationship with AWP to participate in a business competitive with AWP.

16

70. AWP prays that Defendants be ordered to pay to AWP all costs and legal fees incurred in bringing this Complaint and that the Court award against Defendants and in favor of AWP such other relief as the Court may deem just and appropriate.

<u>**COUNT III**</u>
**(Misappropriation of Trade Secrets)**

71. AWP incorporates by reference, as though fully restated herein, the allegations contained in Paragraphs 1 through 70 of the Complaint.

72. Without AWP's consent and in violation of Va. Code §§ 59.1-336 <u>et</u> <u>seq.</u>, Defendants have misappropriated or threatened to misappropriate AWP's confidential and proprietary Trade Secrets, which Trade Secrets AWP has sought to keep secret and which information Defendants knew they were obligated to keep secret. This confidential information was not generally known to, and not readily ascertainable by proper means by, other persons.

73. Defendants have misappropriated or threatened to misappropriate and/or use or used the confidential information and Trade Secrets about AWP and AWP's customers, including, but not limited to, AWP's customer lists and files, prospect lists, customer contacts, pricing information, profit margins for specific customers and projects, customer contact information, internal business procedures, protocols and methodologies for traffic control, and other business materials in an effort to benefit themselves and to harm AWP.

74. The aforementioned confidential and/or proprietary records and information have independent economic value and constitute Trade Secrets.

75. AWP has taken reasonable precautions to maintain such information as confidential information and Trade Secrets, including, but not limited to, limiting the number of AWP's employees who have access to this information.

17

76.     By committing the wrongful acts described herein, Defendants have misappropriated or threatened to misappropriate the Trade Secrets belonging to AWP in violation of the Virginia Uniform Trade Secrets Act, Va. Code §§ 59.1-336 et seq. (hereinafter the "Trade Secrets Act").

77.     Defendants' actions, in violation of the Trade Secrets Act, were willful and malicious and continue to wrongfully possess AWP confidential information and Trade Secrets, without the permission or consent of AWP.

78.     As a result of the conduct alleged herein, AWP has suffered irreparable harm which can be remedied by an injunction pursuant to the Trade Secrets Act.

79.     As a direct, proximate and intended result of the actions of Defendants, AWP will suffer irreparable harm if Defendants are allowed to continue misusing confidential information and Trade Secrets in violation of the Trade Secrets Act.

80.     AWP prays that the Court enter an order enjoining Defendants from benefiting from their unlawful acts by prohibiting them either directly or indirectly, from further soliciting, interfering with or entering into any contracts with any of AWP's customers or potential customers; from using AWP's confidential information and Trade Secrets; and from either directly or indirectly soliciting, interfering with, or otherwise attempting to induce any employee of AWP to leave his employ or other relationship with AWP to participate in a business competitive with AWP.

81.     In addition, AWP seeks all other damages or remedies available to them, including, but not limited to punitive damages and attorney's fees to the full extent permitted under the law as a result of Defendants' knowing, willful, malicious, and intentional conduct.

Case 5:13-cv-00031-MFU-JGW   Document 1   Filed 03/27/13   Page 18 of 22   Pageid#: 18

## COUNT IV
### (Tortious Interference with a Contract or Business Relationship)

82. AWP incorporates by reference, as though fully restated herein, the allegations contained in Paragraphs 1 through 81 of the Complaint.

83. AWP has existing contractual and business relationships with its customers, including, but not limited to, Lumos, Rockingham Construction, Rappahannock Electric, and Shenandoah Valley Electric Cooperative.

84. Defendants were aware of the various relationships and agreements between AWP and its customers.

85. Defendants willfully, wantonly, and in reckless disregard of the rights of AWP interfered with the aforementioned customer relationships and customer agreements.

86. By soliciting preexisting customers of AWP and unlawfully using AWP Trade Secrets and confidential and proprietary information, Defendants harmed and intended to harm AWP by interfering with those contractual and business relationships. This includes, but is not limited to, their use of AWP's confidential information and Trade Secrets, to purposefully and intentionally underbid AWP for work with AWP's customers, including, but not limited to, Lumos, Rockingham Construction, Rappahannock Electric, and Shenandoah Valley Electric Cooperative, in order to negotiate exclusive agreements with these customers.

87. As a direct and proximate result of such tortious interference with AWP's contracts and business relationships, AWP has suffered damages associated with the loss of business and other harm.

88. In tortiously interfering with AWP's contracts and business relationships, Defendants acted with malice and reckless disregard as to the rights of AWP.

Case 5:13-cv-00031-MFU-JGW   Document 1   Filed 03/27/13   Page 19 of 22   Pageid#: 19

89.     Defendants have no justification or privilege that permits them to interfere with AWP's contracts and business relationships.

90.     AWP prays that Defendants be ordered to pay to AWP such compensatory damages as shall make AWP whole for Defendants' unlawful acts in an amount to be proven at trial.

91.     AWP prays that the Court impose a constructive trust upon all amounts received by Defendants as a result of such unlawful acts and award such amount to AWP.

92.     AWP prays that Defendants be ordered to pay punitive damages as proven at trial for its unlawful acts.

93.     AWP prays that the Court enter an order enjoining Defendants from benefiting from their unlawful acts by prohibiting them either directly or indirectly, from further soliciting, interfering with or entering into any contracts with any of AWP's customers; from using AWP's confidential information and Trade Secrets; and from either directly or indirectly soliciting, interfering with, or otherwise attempting to induce any employee of AWP to leave his employ or other relationship with AWP to participate in a business competitive with AWP.

94.     AWP prays that Defendants be ordered to pay to AWP all costs and legal fees it incurs in this matter and that the Court award against Defendants and in favor of AWP such other relief as the Court may deem just.

## COUNT V
### (Unjust Enrichment)

95.     AWP incorporates by reference, as though fully restated herein, the allegations contained in Paragraphs 1 through 94 of the Complaint.

96.     Upon information and belief, Defendants received the financial and competitive advantage of AWP's Trade secrets, confidential information, employees, equipment, and diversion of AWP work to Defendants.

97.     Defendants have no valid legal or equitable right to possession of AWP's Trade Secrets or confidential information, use of AWP's employees and equipment, the diversion of work from AWP to Defendants, or the financial benefits that they have derived from these actions.

98.     Defendants have been unjustly enriched by their possession and use of the Trade Secrets, and their diversion of work from AWP to Defendants.  It would be inequitable for Defendants to retain that benefit.  Accordingly, AWP is entitled to an award equal to the amount of Defendants' unjust enrichment so as to divest the inequitable benefits from them to be returned to the rightful owner.

## PRAYER FOR RELIEF

99.     WHEREFORE, AWP prays for (a) injunctive relief against Defendants; (b) compensatory damages to be proven at trial in an amount greater than $75,000; (c) punitive damages to be proven at trial; (d) an award of treble damages sustained by AWP against Defendants individually, jointly and severally, plus reasonable attorney's fees and costs, pursuant to Va. Code §§ 18.2-499 and 500; (e) reasonable attorney's fees; (f) costs; and (g) any other relief the Court deems appropriate.

Respectfully submitted,

**AWP, Inc.**

March 27, 2013                              By:    _/s/ Steven D. Brown_
                                                                    Counsel

Steven D. Brown (VSB No. 42511)
J. Fielding Douthat, Jr. (VSB No. 46812)
Elizabeth E. Clarke (VSB No. 80231)
LECLAIRRYAN, A PROFESSIONAL CORPORATION
Riverfront Plaza, East Tower
951 East Byrd Street, 8th Floor
Richmond, Virginia 23219
Telephone: (804) 783-2003
Facsimile: (804) 783-2294
*Counsel for AWP, Inc.*

10971879v4